1   DANIEL L. WARSHAW (Bar No. 185365)
        *dwarshaw@pswlaw.com*
2   MICHAEL H. PEARSON (Bar No. 277857)
        *mpearson@pswlaw.com*
3   **PEARSON, SIMON & WARSHAW, LLP**
    15165 Ventura Boulevard, Suite 400
4   Sherman Oaks, California 91403
    Telephone: (818) 788-8300
5   Facsimile: (818) 788-8104

6   MELISSA S. WEINER (*pro hac vice* forthcoming)
        *mweiner@pswlaw.com*
7   DANIEL K. ASIEDU (*pro hac vice* forthcoming)
        *dasiedu@pswlaw.com*
8   **PEARSON, SIMON & WARSHAW, LLP**
    800 LaSalle Avenue, Suite 2150
9   Minneapolis, Minnesota 55402
    Telephone: (612) 389-0600
10  Facsimile: (612) 389-0610

11  [Additional Counsel Listed on Signature Page]

12  *Attorneys for Plaintiffs*

13                  **UNITED STATES DISTRICT COURT**

14          **NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION**

15

16
    SUSAN LAWSON, on behalf of herself and all     | CASE NO.
17  others similarly situated,                      |
                                                     | **CLASS ACTION**
18              Plaintiffs,                          |
                                                     | **COMPLAINT FOR DAMAGES FOR:**
19          v.                                       |
                                                     | 1.  Violation of California's Consumer Legal
20  GERBER PRODUCTS COMPANY,                         |     Remedies Act, Cal. Civ. Code §§ 1750, *et*
                                                     |     *seq.*;
21              Defendant.                           |
                                                     | 2.  Violation of California's Unfair
22                                                   |     Competition Law, Cal. Bus. & Prof. Code
                                                     |     §§ 17200, *et seq.*;
23                                                   |
24                                                   | 3.  Violation of California's False Advertising
                                                     |     Law, Cal. Bus. & Prof. Code § 17500;
25                                                   |
                                                     | 4.  Violation of Various State Consumer
26                                                   |     Protection Laws; and
27                                                   |
                                                     | 5.  Unjust Enrichment/Quasi-Contract.
28                                                   |
                                                     | **JURY TRIAL DEMANDED**

955490.1

# TABLE OF CONTENTS

Page

INTRODUCTION.................................................................................................1

JURISDICTION..................................................................................................3

PARTIES............................................................................................................4

I.     Plaintiff.................................................................................................4

II.    Defendant ...........................................................................................4

FACTUAL ALLEGATIONS................................................................................4

I.     Defendant Markets and Labels Its Products as Being Fit For Consumption by Children and Reasonable Consumers Relied On Defendant's Misrepresentations and Omissions ............................................................................................4

II.    The Truth is Revealed ........................................................................9

III.   The Danger of Toxicants Found in Defendant's Products, and the Defendant's Sale of Said Products ........................................................................11

IV.   Due to Defendant's Misconduct, Plaintiff and the Class Suffered Economic Injury ..........14

CLASS ACTION ALLEGATIONS.....................................................................14

CLAIMS FOR RELIEF .....................................................................................17

     FIRST CLAIM: VIOLATION OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT, Cal. Civ. Code §§ 1750, *et seq.*................................17

     SECOND CLAIM: VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW, Cal. Bus. & Prof. Code §§ 17200, *et seq.* .......................................18

     THIRD CLAIM: VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW, Cal. Bus. & Prof. Code § 17500...................................................20

     FOURTH CLAIM: VIOLATIONS OF VARIOUS STATE CONSUMER PROTECTION ACTS...............................................................................20

     FIFTH CLAIM: UNJUST ENRICHMENT/QUASI-CONTRACT/RESTITUTION .........23

REQUEST FOR RELIEF...................................................................................24

JURY TRIAL DEMAND....................................................................................25

Plaintiff SUSAN LAWSON, on behalf of herself and all others similarly situated ("Plaintiff"), by and through her undersigned attorneys, brings this Class Action Complaint based upon personal knowledge as to herself and her own acts, and as to all other matters upon information, investigation and belief of their counsel.

**INTRODUCTION**

1.      Defendant Gerber Products Company ("Gerber" or "Defendant") is a leading manufacturer and seller of baby food products throughout the country. Defendant holds itself out to consumers as "committed to promoting good nutrition." Among the baby food products Defendant sells, at a premium, are puffs, rice cereals and teethers (collectively, the "Products").[1] Defendant manufactured, sold and marketed the Products nationwide as "natural," "wholesome," "organic," and "Non-GMO" with the promise and commitment of "feeding generations of babies the highest quality of food." Defendant also touts its "Commitment to Quality" stating it "only select[s] the best of what nature has to offer. Because we're parents too and, like you, we'll do everything and anything for baby."[2]

2.      By its own marketing and representations, Defendant knows that food safety is of primary concern to parents. However, contrary to Defendant's marketing statements, the Products contain harmful heavy metal contaminants including inorganic arsenic ("arsenic"), lead, cadmium, and mercury (collectively, the "Toxicants"), that public health authorities and child-safety organizations unanimously agree pose serious risks to children's health and well-being.[3]

3.      Defendant's consistent messaging across different Product formulations, different media, and across all marketing touchpoints means that messaging for any one Product formulation reinforces its inaccurate and misleading claims for other and all formulations.

/ / /

/ / /

---

[1] This is by no means an exhaustive list of Defendant's Products at-issue in this Complaint, merely a representative sample.
[2] https://www.gerber.com/commitment-to-quality (last visited April 21, 2021).
[3] "Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury," House of Representatives Subcommittee on Economic and Consumer Policy (Committee on Oversight and Reform), Staff Report (Feb. 4. 2021).

4.    The Toxicants contained in Defendant's Products are not nutritious, and no reasonable parent would feed a child meals and snacks containing elevated and unacceptable levels of arsenic, lead, cadmium, or mercury.

5.    The Congressional Report by United States House of Representatives Committee on Oversight and Reform examined Defendant's misconduct and revealed that, Defendant's Products not only contain these Toxicants, but at elevated levels that are unacceptable by virtually any public health standard, and certainly are unacceptable to reasonable parents. For example, the Congressional Report showed that test results for conventional rice flour (ingredient present in Defendant's Products) revealed that Defendant routinely used flour with over 90 parts per billion ("ppb") inorganic arsenic. Defendant "used five batches of rice flour that had 98 ppb inorganic arsenic, and 67 batches that contained more than 90 ppb."[4]

6.    Defendant knew of the high and dangerous levels of Toxicants in the Products, effectively rendering the Products unsafe, unfit for their intended purpose and failed to inform Plaintiffs of it—whether on the Products' package label or otherwise. Defendant's deceptive practice resulted in tens of thousands of consumers, if not millions, purchasing Products they thought were safe and healthy. Paying a premium based on Defendant's deceptive behavior, for Products that were in-fact dangerous and poising their babies.

7.    By virtue of this conduct, and all of the conduct alleged herein, Plaintiffs and all members of the Class have been injured by Defendant's actions.

8.    This action asserts claims for violations of California state consumer protection statutes (for the California Class), violations of other state consumer protection laws (for the Multistate Class), and unjust enrichment (quasi-contract or restitution) on behalf of the National Class, the Multistate Class, and the California Class. In addition to restitution, damages (including punitive damages), and other compensatory relief, Plaintiffs seek injunctive relief to prevent further false and misleading representations and to require corrective disclosures to rectify Defendant's omissions regarding the Toxicants found in Defendant's Products.

---

[4] *Id.* at 19.

CLASS ACTION COMPLAINT

**JURISDICTION**

9. **Subject Matter Jurisdiction.** This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy, exclusive of costs and interest, exceeds the sum of $5 million in the aggregate. In total, there are well over 100 members of the proposed Classes that are known to exist, and this is a class action in which complete diversity exists between one Plaintiff and one Defendant – namely, that Plaintiff Lawson is a citizen of California, while Defendant Gerber Products Company is headquartered in, and therefore is a citizen of, Virginia.

10. **General Personal Jurisdiction.** This Court has general personal jurisdiction over Defendant because Defendant purposefully availed itself of the privilege of doing business within the state, including within this District; had continuous and systematic general business contacts within the state, including within this District; and Defendant can be said to have reasonably anticipated being hailed into court in this forum.

11. **Specific Personal Jurisdiction.** This Court has specific personal jurisdiction over Defendant because this action arises out of and relates to Defendant's contacts with this forum. Specifically, Defendant knowingly directed the Products through the stream of commerce into this District. Defendant advertised and marketed within this District through the wires and mails and via e-commerce websites through which residents of this state and District can purchase the Products. Defendant knowingly directs electronic activity into this state and District with the intent to engage in business interactions and has, in fact, engaged in such interactions. Defendant sold the Products in this District, including to Plaintiffs, some who reside in this District, who purchased the Products in this District, and whose losses were incurred here. Defendant cultivated a market for the Products in this state and District and systematically served a market for the very Products causing the harms alleged in this Complaint. Thus, there is an affiliation between this forum and the underlying controversy and there is a strong relationship among Defendant, the forum, and the litigation.

12. **Venue.** Venue is proper in this District pursuant to 28 U.S.C. 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in this District. Venue also is proper pursuant to 28 U.S.C. 1391(b)(1) and 1391(c)(2) because Defendant is deemed to be

a resident of this District by virtue of the Court's personal jurisdiction over Defendant with respect to this action.

**PARTIES**

**I.      Plaintiff**

13.      Plaintiff Susan Lawson is a citizen of the State of California and is a member of the Class as a purchaser of Defendant Gerber's Products. Plaintiff purchased the Products—specifically including but not limited to MultiGrain Cereal (Sitter 2nd Foods), turkey vegetable ravioli, yogurt melts, apple cinnamon puffs, probiotic oatmeal peach apple, and teethers strawberry apple spinach—at a Safeway store (and others) in California, and she relied on the Defendant's representations (and omissions) as described herein. Plaintiff purchased the Products in October 2020 and February 2021.

**II.      Defendant**

14.      Defendant Gerber Products Company is a Michigan corporation and maintains its headquarters in the State of Virginia. Defendant is a subsidiary of Nestlé S.A., a Swiss corporation.

**FACTUAL ALLEGATIONS**

**I.      Defendant Markets and Labels Its Products as Being Fit for Consumption by Children and Reasonable Consumers Relied on Defendant's Misrepresentations and Omissions**

15.      Defendant markets and represents the products it sells to consumers as having quality ingredients and its commitment to quality asserting: "[w]e know the best nutrition for baby starts with the highest quality ingredients." "[W]e believe little ones deserve the very best. That's why we have stringent quality and food safety standards for all our foods. Not to brag, but many of our food safety and quality standards even exceed government requirements."[5] "Good enough is never enough"—"We meet the standards of the FDA, but we don't stop there. We go further. We have among the strictest standards in the world. From farm to highchair, **we go through over 100 quality checks for every jar**."[6]

///

---

[5] https://www.gerber.com/our-ingredients (last visited April 21, 2021).
[6] https://www.gerber.com/commitment-to-quality (emphasis added) (last visited April 21, 2021).

CLASS ACTION COMPLAINT

16.    Defendant also markets, represents and essentially assures parents and consumers that they can "Count on [Gerber] for Quality."



17.    Contrary to Defendant's self-proclaimed commitment to "quality," the Products contained unhealthy levels of Toxicants. For example, the Congressional Report showed that Defendant used high-arsenic ingredients in the Products. "[Defendant] used five batches of *rice flour that had 98 ppb inorganic arsenic, and 67 batches that contained more than 90 ppb*."[7] Below is an illustration of the presence of rice flour in some of Defendant's Products.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[7] *Congressional Report* at 19 (emphasis added).

| Banana Puffs | Strawberry Apple Spinach Teethers | Single Grain Cereal Rice |
| --- | --- | --- |
|  |  |  |
| **INGREDIENTS:** RICE FLOUR, WHOLE WHEAT FLOUR, WHEAT STARCH, CANE SUGAR, WHOLE GRAIN OAT FLOUR, NATURAL BANANA FLAVOR, DRIED APPLE PUREE, MIXED TOCOPHEROLS (TO MAINTAIN FRESHNESS), SUNFLOWER LECITHIN, CARAMEL COLOR, TURMERIC EXTRACT COLOR | **INGREDIENTS:** RICE FLOUR, TAPIOCA STARCH, SUGAR, STRAWBERRY PUREE, DRIED APPLE JUICE, DRIED SPINACH, MIXED TOCOPHEROLS (TO MAINTAIN FRESHNESS). | **INGREDIENTS:** RICE FLOUR, SOY LECITHIN, POTASSIUM PHOSPHATE |

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

18.     Plaintiff Lawson purchased the Product depicted below, which contains materially similar representations to all Products at issue in this Complaint. Plaintiff and all members of the Class viewed the representations on the labeling of the Products at the point of purchase. These representations are intended to impact, and do in fact impact, every reasonable parent's decision regarding which foods to purchase for their young children.



19.     Defendant never revealed to Plaintiff and the Class that, among other things, ingredients used in their product contained unhealthy levels of inorganic arsenic.

20.     Defendant promotes the Products as safe and health for children, yet conceals the presence and elevated levels of the Toxicants because no reasonable parent would purchase the Products at the price offered, or on the same terms, or as frequently, or would not purchase the Products at all, if this information were disclosed.

21.     As the manufacturer and seller of the Products, Defendant is responsible for the accuracy of information conveyed on the Product labels.

22.     Plaintiffs reasonably believed that the Products they purchased were free of concerning levels of Toxicants that, in fact, were present at levels that would gravely concern any reasonable consumer.

/ / /

23.    Defendant knew or, in the exercise of reasonable care, should have known that the Products' labels were false or misleading.

24.    Defendant intended for consumers to rely upon its representations and omissions concerning the Products' nature and quality.

25.    It would be reasonable for consumers to rely—as Plaintiff did—upon Defendant's representations and omissions concerning the Products.

26.    Defendant's misrepresentations and omissions were made with the intent to generate and increase sales of the Products.

27.    Defendant's misrepresentations and omissions were deceptive and misleading for the reasons set forth in this Complaint; and they are ongoing.

28.    By representing the Products as wholesome and organic (where applicable), Defendant implicitly represented the Products' value to Plaintiff and other consumers.

29.    As a consequence of Defendant's unfair and deceptive practices, Plaintiff and other similarly-situated consumers purchased a product of different and substantially lesser value—one with a higher effective cost—than Defendant represented, under the false impression that the Products were safe, high-quality, premium Products free of elevated levels of Toxicants.

30.    In fact, because the Products contained elevated levels of Toxicants, they should not have been on the market in the first place, and thus the Products were of less value or even valueless—*i.e.*, the threat of exposure to high levels of Toxicants would render the Products of no value to reasonable consumers because no reasonable consumer would willingly administer repeated, elevated doses of Toxicants to his or her child.

31.    Defendant's omission of all reference to the Toxicants deprived Plaintiff and other consumers the opportunity to make an informed choice whether to Purchase the Products.

32.    Accordingly, Plaintiff and the Class did not realize the benefit of the bargain and their expectations were not met.

33.    Plaintiffs and the Class effectively paid more than the market value represented by the price bargained for. Plaintiff and the Class bargained with Defendant on a particular market value

for a Product purporting to be a high-quality, premium food—one that would not contain unacceptable levels of Toxicants.

34.     However, unbeknownst to consumers, the Products do contain unacceptable levels of Toxicants; Plaintiff and the Class thus effectively paid for Products that were worth less than they were led to reasonably believe, *i.e.*, Plaintiff and the Class overpaid for the Products.

35.     Thus, through the use of misleading representations and omissions, Defendant obtained enhanced negotiating leverage allowing it to command a price Plaintiffs and the Class would not have paid had they been fully informed.

36.     By use of misleading marketing and labeling claims and omissions, Defendant created increased market demand for the Products and increased its market share relative to what its demand and share would have been had it marketed and labeled the Products truthfully.

37.     Plaintiff and the Class lost money as a result of Defendant's misrepresentations and omissions in that they did not receive what they reasonably believed they were paying for based upon the misrepresentations and omissions. Plaintiff and the Class detrimentally altered their position and suffered damages as a result of Defendant's misrepresentations and omissions.

38.     If Plaintiff had been aware that the Products contained unacceptable levels of any Toxicant, Plaintiff would have purchased a different product or no product at all. In other words, Plaintiff would not have purchased Defendant's Product but for Defendant's misrepresentations and omissions.

39.     Plaintiff and the Class were exposed to and justifiably relied upon the same material misrepresentations and omissions made on the Products' labels.

## II.     The Truth is Revealed

40.     The recent Congressional Report released by the U.S. House of Representatives revealed that prominent brands of baby food Products contains "concerning levels" of the Toxicants at-issue.

41.     Public health authorities have expressed concern regarding consumption of the Toxicants. For example, according to the Congressional Report, the Food and Drug Administration (the "FDA") has expressed concern regarding arsenic levels above 100 ppb in infant rice cereals,

arsenic above 10 ppb in drinking water, lead above 5 ppb in drinking water, lead above 50 ppb in juice products, and cadmium above 5 ppb in drinking water. Defendant's Products routinely tested at levels exceeding these limits.

42.     The Congressional Report used in-house internal data provided by the Defendant (to the extent Defendant provided it) to reveal that, in reality, the Defendant's baby food products contain the Toxicants at-issue[8] which are detrimental to children.

43.     The Congressional Report expressed concerns over the level of Toxicants—arsenic, lead, cadmium and mercury—found in Defendant's baby foods. The level of Toxicants present in Defendant's Products far exceeds what would be considered acceptable, if any. For example, the FDA has set a maximum allowable levels of arsenic in bottled water at 10 ppb; 5 ppb for both lead and cadmium.[9] The Environmental Protection Agency (the "EPA") has capped allowable level of mercury in drinking water at 2 ppb.[10] The Congressional Report revealed numerous instances where Toxicants in Defendant's products eclipsed these levels.

44.     According to the Congressional Report, arsenic levels in routinely used ingredients (flour) by Defendant was over 90 ppb—significantly higher than the 10 ppb recommended by the FDA in bottled water. Defendant "used five batches of rice flour that had 98 ppb inorganic arsenic, and 67 batches that contained more than 90 ppb."[11]

45.     Regarding lead, the Congressional Report showed that, Defendant used ingredients that tested as high as 48 ppb lead. For example, "the results for [Defendant's] sweet potatoes and juices demonstrated its willingness to use ingredients that contained dangerous lead levels."[12] Defendant used an ingredient, conventional sweet potatoes, with 48 ppb lead.[13] "The average amount of lead in Gerber's tested juice concentrates was 11.2 ppb—more than FDA's limit for lead

---

[8] *Id.* at 19-21, 27-28, 32-33.
[9] *Id.* at 4.
[10] *Id.*
[11] *Id.* at 19.
[12] *Id.* at 27.
[13] *Id.*

1    in bottled water. Over 83% of the juice concentrates tested showed greater than 1 ppb lead, which

2    is Consumer Reports' recommended limit for fruit juices."[14]

3        46.    According to the Congressional Report, Defendant does not test all if its ingredients

4    for cadmium.[15] However, of those it does test, it accepts ingredients with high levels of cadmium.

5    For example, Defendant "used multiple batches of carrots containing as much as 87 ppb cadmium,

6    and 75% of the carrots [Defendant] used had more than 5 ppb cadmium."[16]

7        47.    The Congressional Report stated that Defendant "barely tests for mercury" and "[o]f

8    the test results [Defendant] presented to the Subcommittee, they only tested carrots, sweet potatoes,

9    and lemon juice concentrate."[17]

## III.   The Danger of Toxicants Found in Defendant's Products, and Defendant's Sale of Said Products

        48.    The Congressional Report emphasized the dangers posed by the Toxicants in

Defendant's Products:

> Children's exposure to toxic heavy metals causes permanent
> decreases in IQ, diminished future economic productivity, and
> increased risk of future criminal and antisocial behavior. Babies'
> developing brains are "exceptionally sensitive to injury caused by
> toxic chemicals, and several developmental processes have been
> shown to be highly vulnerable to chemical toxicity." The fact that
> babies are small, have other developing organ systems, and absorb
> more of the heavy metals than adults, exacerbates their risk from
> exposure to heavy metals. Exposure to heavy metals at this
> developmental stage can lead to "untreatable and frequently
> permanent" brain damage, which may result in "reduced intelligence,
> as expressed in terms of lost IQ points, or disruption in behavior." For
> example, a recent study estimates that exposure to environmental
> chemicals, including lead, are associated with 40,131,518 total IQ
> points loss in 25.5 million children (or roughly 1.57 lost IQ points per
> child)—more than the total IQ losses associated with preterm birth
> (34,031,025), brain tumors (37,288), and traumatic brain injury
> (5,827,300) combined. For every one IQ point lost, it is estimated that
> a child's lifetime earning capacity will be decreased by $18,000.
> Well-known vectors of child exposure to toxic heavy metals include
> lead paint in old housing and water pollution from landfills. Over the
> decades, a range of federal and state laws and regulations have been
> passed to protect child health through emissions standards, among
> other things. The Food and Drug Administration (FDA) has declared

---

[14] *Id*. at 28.
[15] *Id*. at 32.
[16] *Id*.
[17] *Id*. at 33.

that inorganic arsenic, lead, cadmium, and mercury are dangerous, particularly to infants and children. They have "no established health benefit" and "lead to illness, impairment, and in high doses, death." According to FDA, "even low levels of harmful metals from individual food sources, can sometimes add up to a level of concern." FDA cautions that infants and children are at the greatest risk of harm from toxic heavy metal exposure. The Subcommittee on Economic and Consumer Policy's investigation has found another source of exposure: baby foods. According to documents obtained from baby food manufacturers, toxic heavy metals, such as arsenic, cadmium, lead, and mercury are present at substantial levels in both organic and conventional baby foods. Currently, there is no federal standard on, or warning to parents and caregivers about, these toxins.[18]

With respect to arsenic, the Congressional Report states:

Arsenic is ranked number one among substances present in the environment that pose the most significant potential threat to human health, according to the Department of Health and Human Services' Agency for Toxic Substances and Disease Registry (ATSDR). The known health risks of arsenic exposure include "respiratory, gastrointestinal, haematological, hepatic, renal, skin, neurological and immunological effects, as well as damaging effects on the central nervous system and cognitive development in children." Studies have concluded that arsenic exposure has a "significant negative effect on neurodevelopment in children." This negative effect is most pronounced in Full Scale IQ, and more specifically, in verbal and performance domains as well as memory. For every 50% increase in arsenic levels, there is an approximately "0.4 decrease in the IQ of children." A study of Maine schoolchildren exposed to arsenic in drinking water found that children exposed to water with an arsenic concentration level greater than 5 parts per billion (ppb) "showed significant reductions in Full Scale IQ, Working Memory, Perceptual Reasoning and Verbal Comprehension scores." The authors pegged 5 ppb as an important threshold. Likewise, a study of children in Spain found that increasing arsenic exposure led to a decrease in the children's global motor, gross motor, and fine motor function scores. Boys in particular were more susceptible to arsenic's neurotoxicity.[19]

With respect to lead, the Congressional Report states:

Lead is number two on ATSDR's list of substances present in the environment that pose the most significant potential threat to human health. Even small doses of lead exposure are hazardous, particularly to children. Lead is associated with a range of bad health outcomes, including behavioral problems, decreased cognitive performance, delayed puberty, and reduced postnatal growth. According to FDA, lead is especially dangerous to "infants" and "young children." FDA acknowledges that: High levels of lead exposure can seriously harm children's health and development, specifically the brain and nervous system. Neurological effects from high levels of lead exposure during

[18] *Id.* at 9-10 (internal citations omitted).
[19] *Id* (internal citations omitted).

12

early childhood include learning disabilities, behavior difficulties, and lowered IQ. Because lead can accumulate in the body, even low-level chronic exposure can be hazardous over time. Lead exposure severely affects academic achievement in children. Even at low levels, early childhood lead exposure has a negative impact on school performance. Two separate studies of schoolchildren in Detroit and Chicago public schools found a strong inverse relationship between lead exposure and test scores. In the Detroit study, there was a "significant association" between early childhood lead exposure and decreased standardized test performance, with lead exposure strongly linked to an adverse effect on academic achievement. The Chicago study found that higher blood lead concentrations were associated with lower reading and math scores in 3rd grade children. Increased blood lead concentrations correlated with a 32% increase in the risk of failing reading and math. The cognitive effects of early childhood lead exposure appear to be permanent. In one study, adults who previously had lead-associated developmental delays continued to show persisting cognitive deficits, demonstrating the long-lasting damage of lead exposure.[20]

With respect to cadmium, the Congressional Report states:

Cadmium is number seven on ATSDR's list of substances present in the environment that pose the most significant potential threat to human health. Cadmium is associated with decreases in IQ, as well as the development of ADHD. A 2018 study found that cadmium exposure negatively affected children's Full Scale IQ, particularly among boys. Boys exhibiting higher amounts of cadmium exposure had seven fewer IQ points than those exhibiting less cadmium exposure. A 2015 study similarly found a significant inverse relationship between early cadmium exposure and IQ. A 2018 study linked cadmium exposure to ADHD, finding that the disorder was more common among children with the highest levels of cadmium exposure as compared to a control group.[21]

With respect to mercury, the Congressional Report states:

Mercury is number three on ATSDR's list of substances present in the environment that pose the most significant potential threat to human health. Studies of mercury's effect on childhood development have primarily been conducted by considering the mother's exposure to mercury while pregnant. In these instances, "pre-natal mercury exposure has been consistently associated with adverse subsequent neuro-development." And pre-natal mercury exposure is also related to poorer estimated IQ. Beyond prenatal exposure, higher blood mercury levels at "2 and 3 years of age were positively associated with autistic behaviors among preschool-age children.[22]

---

[20] *Id* at 11 (internal citations omitted).
[21] *Id* at 12 (internal citations omitted).
[22] *Id* at 12-13 (internal citations omitted).

49.     Defendant has shown no concern for the health risks faced by the end-users of their Products—vulnerable young children—in fact, Defendant continues today selling these Products without any indication to consumers that the Products contain alarming levels of Toxicants.

50.     Not only did Defendant knowingly mislead parents into believing the Products were safe, Defendant charged a premium for them. Plaintiff and the Class would not have purchased the Products if they were aware of the elevated presence of the Toxicants or, alternatively, they would not have purchased at the Products' offered price and terms.

## IV.     Due to Defendant's Misconduct, Plaintiff and the Class Suffered Economic Injury

51.     Plaintiffs and the Class were injured economically when they purchased the Products. As alleged herein, Plaintiff and the Class received something worth less than what they paid for, and did not receive the benefit of their bargain. They paid for Products which were supposed to be wholesome, but were not. No reasonable consumer would have purchased or paid as much or as frequently for the Products had they known the Products contained elevated levels of Toxicants. Defendant knew of the Toxicants and the levels at which they occur in the Products, but chose not to disclose this material information to their consumers in an effort to persuade them they were buying wholesome Products rather than Products with elevated levels of Toxicants.

## CLASS ACTION ALLEGATIONS

52.     Plaintiff brings this action on behalf of herself and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of members of the following proposed Classes:

> **National Class.** All persons within the United States who purchased one or more of the Products from the beginning of the applicable statutory period through present (the "National Class").

> **Multistate Class.** All persons within the States of California, Florida, Illinois, New York, North Carolina, Ohio, and Washington who purchased one or more of the Products from the beginning of the applicable statutory period through present (the "Multistate Class").

> **California Class.** All persons within the State of California who purchased one or more of the Products from the beginning of the applicable statutory period through present (the "California Class").

53.     Unless otherwise stated, use of the term "Class" throughout this Complaint refers to the National Class, the Multistate Class, and the California Class, collectively.

54.     Excluded from the Class are Defendant, any of their respective members, affiliates, subsidiaries, officers, directors, employees, successors or assigns, the judicial officers, and their immediate family members; as well as the Court staff assigned to this action.

55.     Plaintiffs reserve the right to modify or amend Class definitions as appropriate during the pendency of this Action.

56.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiff can prove the elements of the claims on a class-wide basis using the same evidence as individual Class members would use to prove those elements in individual actions alleging the same claims.

57.     This action has been brought and may be properly maintained as a class action under the criteria of Rule 23:

**Numerosity – Rule 23(a)(1).** The members of each of the Classes are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. The precise number of Class numbers is unknown to Plaintiffs but is likely to be ascertained by Defendant's records. At a minimum, there likely are tens of thousands of Class Members.

**Commonality and Predominance – Rule 23(a)(2),(b)(3).** This action involves questions of law and fact common to the Classes, which predominate over any individual questions, including:

a.      whether Defendant engaged in the conduct alleged herein;

b.      whether Defendant's course of conduct alleged herein violates the statutes and other laws that are pled in this Complaint;

c.      whether Defendant intended for consumers to rely upon its representations and omissions;

d.      whether reasonable consumers would rely upon Defendant's representations and omissions;

e.      whether Defendant knew or should have known its representations and omissions were false or misleading;

f.      whether reasonable consumers were misled by Defendant's labeling, marketing and advertising of the Products;

g.      whether Defendant was unjustly enriched by retaining monies from the sale of the Products at issue;

h.      whether certification of the Class is appropriate under F.R.C.P. Rule 23;

i. whether Plaintiffs and the Class are entitled to declaratory, equitable, or injunctive relief, and/or other relief, and the scope of such relief; and

j. the amount and nature of the relief to be awarded to Plaintiffs and the Class, including whether Plaintiffs and the Class are entitled to punitive damages.

**Typicality – Rule(a)(3).** Plaintiff's claims are typical of the other Class members because the Plaintiff, as well as the members of the Class, paid for Defendant's contaminated Products at retail. Plaintiff and the members of the Class relied on the representations and omissions made by the Defendant prior to making their purchase of the Products at issue. Plaintiff and the Class paid for Defendant's products at retail and would not have purchased them (or would have paid substantially less for them) had they known that the Defendant's representations were untrue and/or had they possessed the information Defendant omitted from the labels regarding the Toxicants.

**Adequacy of Representation – Rule 23(a)(4).** Plaintiff is an adequate Class representative because Plaintiff's interests do not conflict with the interests of the other Class members whom she seeks to represent, Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously. Class members' interests will be fairly and adequately protected by Plaintiff and her counsel.

**Superiority of Adjudication as a Class Action – Rule 23(b)(3).** To preserve judicial economy, this case will be best maintained as a class action, which is superior to other methods of individual adjudication of these claims. This action is best maintained as a class action because of the large number of consumers affected by the alleged violations of law as well as the relatively smaller-purchase economic damages being sought by Plaintiff and the Class. The damages individual Class members suffered are small compared to the burden and expense of individual prosecution of the complex and extensive litigation needed to address Defendant's conduct, such that it would be virtually impossible for the Class to redress the wrongs done to them and they would have little incentive to do so given the amount of damage each Class member has suffered when weighed against the costs and burdens of litigation. The class procedure presents fewer management difficulties than individual litigation and provides the benefits of single adjudication, economies of scale, and supervision by a single court.

/ / /

**Certification of Specific Issues – Rule 23(c)(4).** To the extent that a Class does not meet the requirements of Rules 23(b)(2) or (b)(3), Plaintiff seeks certification of issues that will drive this litigation toward resolution.

**Declaratory and Injunctive Relief – Rule 23(b)(2).** Defendant has acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class members as a whole. Unless a class-wide injunction is issued, Defendant will continue to, or allow their resellers to, advertise, market, promote, and sell the Products in an unlawful and misleading manner, as described throughout this Complaint, and members of the Class will continue to be misled, harmed, and denied their rights under the law.

58.    Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

### FIRST CLAIM:

### VIOLATION OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT,

### Cal. Civ. Code §§ 1750, *et seq.*

### (Individually and on Behalf of the California Class)

59.    Plaintiffs reallege and incorporate the foregoing paragraphs.

60.    Plaintiff Lawson brings this claim individually and on behalf of the California Class (referred to throughout this Count as "the Class").

61.    Defendant's conduct constitutes violations under the California's Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.* ("CLRA").

62.    Defendant's conduct falls within the meaning of this statute because it caused transactions to occur resulting in the sale or lease of goods or services to consumers – namely, the sale of the Products, which is baby food. Baby food is considered to be "goods" within the meaning of the statute under Civil Code 1761(a) and Defendant's sale of baby food is considered a service under Civil Code 1761(b).

63.    Plaintiff and members of the Class are consumers pursuant to the statute.

64.     Defendant violated the CLRA by way of the following provisions:

a.     Passing of the Products as that of another, specifically indicating the Products are safe for young children when in fact they are not in violation of Civ. Code § 1770(a)(1);

b.     Representing that the Products have "characteristics" which they do not have in violation of Cal. Civ. Code § 1770(a)(5);

c.     Representing that the Products are of a "particular standard, quality, or grade" when they were not in violation of Cal. Civ. Code § 1770(a)(7);

d.     Advertising the Products be safe for young children with the "intent not to sell them as advertised" in violation of Cal. Civ. Code § 1770(a)(9); and

e.     Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not in violation of Cal. Civ. Code § 1770(a)(16).

65.     Defendant is aware that its representations are false and misleading.

66.     Due to Defendant's conduct, Plaintiff and members of the Class suffered ascertainable economic injury.

67.     Pursuant to the provisions of Cal. Civ. Code § 1782(a), Plaintiff provided notice to Defendant of its alleged violations of the CLRA, demanding that Defendant correct such violations, and providing it the opportunity to correct its business practices. If Defendant does not do so, Plaintiffs will seek leave to amend the Complaint to add claims for monetary relief, including restitution and actual damages under the Consumers Legal Remedies Act. Notice was sent via certified mail, return receipt requested, on May 26, 2021.

68.     Accordingly, Plaintiffs seek injunctive relief, reasonable attorneys' fees and costs, and all other available relief as pled in this Complaint. Plaintiffs will seek to amend this Complaint at the appropriate time to assert claims for damages.

**SECOND CLAIM:**

**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW,**

**Cal. Bus. & Prof. Code §§ 17200, *et seq.***

**(Individually and on Behalf of the California Class)**

69.     Plaintiffs reallege and incorporate the foregoing paragraphs.

70.     Plaintiff Lawson brings this claim individually and on behalf of the California Class (referred to throughout this Count as "the Class").

71.     Defendant's conduct constitutes unfair business acts or practices under the California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*. ("UCL").

72.     Defendant's business practices are considered to be "unfair" because it violates California's Unfair Competition Law, which states that unfair acts are acts where the reasons, justifications and motivations of Defendant are outweighed by the harm to Plaintiff(s).

73.     A business practice is also considered to be "unfair" if the conduct alleged is immoral, unethical, oppressive, or substantially injurious to consumers; as well as if the conduct alleged causes an injury which is not outweighed by any benefits to other consumers or to competition, and that the injury is of the type that the consumer could not have avoided. Defendant's conduct is "unfair" pursuant to the UCL under each of the three tests described in these paragraphs.

74.     Defendant's behavior constitutes unfair business practices under California law.

75.     Defendant's retention of Plaintiff's and Class members' payments for the Products with the issues as described herein, namely, that the Products are not wholesome as advertised, are not organic (where applicable), and are not fit for consumption by young children, does not outweigh the economic harm that said retention imposes on consumers. The only party that benefits is Defendant. Defendant's sale of the Products with the misrepresentations discussed herein are immoral, unethical, oppressive, and substantially injures consumers.

76.     Plaintiff and members of the Class had no way of knowing that Defendant's Products contained Toxicants. And, as Defendant continues to unfairly retain Plaintiff's and members of the Class' payments for the Products, this conduct continues to be unfair under California law. This is exactly the type of unscrupulous and inexcusable business practice that the UCL was enacted to address.

77.     As a result of Defendant's conduct, Plaintiff and Class members have suffered injury-in-fact by way of lost assets. Plaintiffs request that the Court issue sufficient equitable relief to restore them and Class members to the position they would have been had Defendant not engaged in unfair business practices. Plaintiffs seek all other available relief as pled in this Complaint.

/ / /

/ / /

**THIRD CLAIM:**

**VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW,**

**Cal. Bus. & Prof. Code § 17500**

**(Individually and on Behalf of the California Class)**

78.     Plaintiffs reallege and incorporate the foregoing paragraphs.

79.     Plaintiff Lawson brings this claim individually and on behalf of the California Class (referred to throughout this Count as "the Class").

80.     Defendant violated California's False Advertising Law, Cal. Bus. & Prof. Code § 17500 ("FAL"), by publicly disseminating misleading and false advertisements through advertising and marketing statements, suggesting that consumers purchase the Products at-issue:

        a.     that the Products are wholesome;

        b.     that the Products are organic, where applicable; and

        c.     that the Products are fit for consumption by children.

81.     Defendant's contribution to the false and misleading advertisements were made in order to prop up and increase sales of the Products at-issue.

82.     Defendant knew these false and misleading advertisements were untrue.

83.     Plaintiff and members of the proposed Classes would not have bought these products had they known that any or all of these misrepresentations were false.

84.     Pursuant to Business & Professions Code § 17500, Plaintiff and members of the Class seek an order of this Court permanently enjoining Defendant from continuing to publicly disseminate misleading and false advertisements as alleged herein. Plaintiff and Class Members also seek an order requiring Defendant to: (a) make full restitution for all monies wrongfully obtained; and (b) disgorge all ill-gotten revenues and/or profits. Plaintiffs seek all other available relief as pled in this Complaint.

**FOURTH CLAIM:**

**VIOLATIONS OF VARIOUS STATE CONSUMER PROTECTION ACTS**

**(Individually and on behalf of the Multistate Class)**

85.     Plaintiffs reallege and incorporate the foregoing paragraphs.

86.     Plaintiffs bring this claim for deceptive acts and practices in violation of various states' consumer protection statutes individually, as to her respective states' laws, and on behalf of the Multistate Class, as to the laws of the other states (referred to throughout this count as "the Class").

87.     The various state laws cited below, upon which this Count is premised, are consonant with one another and with the laws of the Plaintiff's respective states, both procedurally and substantively.

88.     Defendant has engaged in deceptive, unfair, unconscionable, and fraudulent acts and practices that have caused actual damages to Plaintiff and the Class, as described herein, including the knowing and intentional misrepresentations and omissions described with respect to the marketing, advertising, promotion, packaging, labeling, and sale of the Products.

89.     Defendant's deceptive, unfair, unconscionable, and fraudulent acts and practices have been carried out in the course of conducting Defendant's business, trade, and commerce.

90.     Such acts and practices—including Defendant's intentional efforts to mislead consumers by the misrepresentations and omissions alleged throughout this Complaint—are willful, unfair, unconscionable, deceptive, immoral, unethical, oppressive, unscrupulous, contrary to public policy, and substantially injurious to consumers, including Plaintiff and the Class.

91.     Such acts and practices, including Defendant's misrepresentations and omissions, have the capacity to mislead, deceive, and confuse a substantial portion of the public and all reasonable consumers in a material way and have in fact misled, deceived, and confused Plaintiff and the Class in a material way, as Defendant intended.

92.     Defendant's intentionally false, deceptive, misleading, and confusing representations and omissions would be material to any ordinary, average, and reasonable consumer's decision whether to buy the Product, given that they pertain to a fundamental and important feature of the Products. No reasonable consumer would have purchased the Products but for Defendant's acts and practices, including its misrepresentations and omissions, described throughout this Complaint.

/ / /

/ / /

93. Any ordinary, average, objectively reasonable consumer acting reasonably in the circumstances would have been deceived by Defendant's acts and practices, including the misrepresentations and omissions described herein.

94. Defendant's acts are unconscionable and actuated by bad faith, lack of fair dealing, actual malice, are accompanied by a wanton and willful disregard for consumers' well-being and are motivated solely by the desire for financial gain.

95. As a direct and proximate result of Defendant's deceptive practices, Plaintiff and the Class have sustained actual damages including but not limited any price premium paid and other damages alleged in this Complaint.

96. Plaintiff's claims under the laws of California are representative of similar claims available to Multistate Class members under the laws of other states, which are consonant with one another and with the laws of California.

97. Defendant's acts and practices described herein constitute unfair competition and deceptive, unfair, unconscionable, and fraudulent acts and practices in violation the following state consumer protection statutes:

a. California's Consumer Legal Remedies Act ("CLRA") (Cal. Civ. Code §§ 1750, *et seq.*), California's Unfair Competition Law ("UCL") (Bus. & Prof. Code §§ 17200 *et seq.*), and California's False Advertising Law Cal. Bus. & Prof. Code § 17500;

b. Florida Deceptive and Unfair Trade Practices Act (§§ 501.201, Fla. Stat., *et seq.*);

c. Illinois Consumer Fraud and Deceptive Business Practices Act (815 Ill. Comp. Stat. 505/1, *et seq.*);

d. New York Deceptive Acts and Practices Act (N.Y. Gen. Bus. Law §§ 349, *et seq.*) and New York False Advertising Law (N.Y. Gen. Bus. Law §§ 349, *et seq.*);

e. North Carolina Unfair and Deceptive Trade Practices Act (N.C. Gen. Stat. §§ 75-1.1, *et seq.*);

f. Ohio Consumer Sales Practices Act (ORC §§ 4165.01, *et seq.*) and Ohio Deceptive Trade Practices Act (ORC §§ 4165.01, *et seq.*); and

g. Washington Consumer Protection Act (Wash. Rev. Code §§ 19.86.010, *et seq.*

///

///

98.     Accordingly, Plaintiffs and the Class seek a declaration or declaratory judgment that Defendant's acts and practices have violated and continue to violate the foregoing laws and all other available relief as pled in this Complaint.

## FIFTH CLAIM:

## UNJUST ENRICHMENT/QUASI-CONTRACT/RESTITUTION

## (Individually and on Behalf of all Classes)

99.     Plaintiffs reallege and incorporate the foregoing paragraphs.

100.    Plaintiffs bring this claim for unjust enrichment also referred to as quasi-contract or restitution, in violation of the law of the states identified in the Multistate Class, all of which are consonant with one another. Plaintiffs plead this claim in the alternative to their claims for legal relief.

101.    Plaintiffs bring this claim individually and on behalf of the National Class, the Multistate Class, and the California Class (referred to throughout this Count as "the Class").

102.    Plaintiffs and the Class purchased the Products and paid a premium for said products—products which misrepresented or omitted the quality of the products which justified the premium.

103.    Plaintiffs and the Class paid more than the fair value of Defendant's Products as reflected in any price premium paid and for the reasons alleged above.

104.    Because of Defendant's wrongful acts and practices, Defendant charged, and Plaintiffs and the Class paid, a higher effective price for the Products than that which reflects their true value and Defendant accordingly obtained monies that rightfully belong to Plaintiff and the Class.

105.    Defendant received a direct benefit from Plaintiffs and the Class in the form of Product sales and increased market share for the Products. Defendant obtained this benefit by its misrepresentations and omissions because those misrepresentations and omissions induced reasonable consumers to purchase the Products they would not otherwise have purchased.

106.    Defendant appreciated this benefit and knowingly accepted it at the expense of, and to the detriment of, Plaintiffs and the Class. Defendant currently retains this benefit.

107. Under the circumstances, it would be inequitable and unjust, and it would violate fundamental principles of justice, equity, and good conscience, for Defendant to retain this wrongfully obtained benefit.

108. Accordingly, Plaintiffs and the Class seek restitution and disgorgement of all inequitably retained monies resulting from the purchases made by Plaintiffs and the Class and all other available relief as pled in this Complaint.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendant as follows:

a. certify this case as a class action representing the Classes as defined herein pursuant to Rule 23, designate Plaintiff as representative for the Classes, and appoint counsel of record as class counsel;

b. declare Defendant's conduct unlawful under the statutes and causes of action pled herein;

c. enter an order enjoining Defendant to refrain from the acts and practices cited herein and to undertake an immediate public information campaign to inform members of each of the Classes as to its prior practices;

d. enter an order requiring imposition of a constructive trust and and/or disgorgement of Defendant's ill-gotten gains and to pay restitution to Plaintiff and all members of each of the Classes to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, fraudulent or unfair business act or practice;

e. enter an award of damages, including all available statutory and punitive damages, pursuant to the statutes and the causes of action pled herein;

f. distribute any monies recovered on behalf of members of each of the Classes via fluid recovery or *cy pres* recovery where necessary and applicable, to prevent Defendant from retaining the benefit of its wrongful conduct;

g.     enter an order Defendant to pay for the costs of the proceedings herein as well as reasonable attorney's fees, costs, and expense as allowable by statute or other law;

h.     enter an order requiring Defendant to proffer an equitable plan to refund Plaintiff's and the Class members' monies; and

i.     award any other such relief that this Court deems necessary and proper.

## **JURY TRIAL DEMAND**

Plaintiff and members of the Classes hereby demand a trial by jury of all issues so triable.

Dated:     May 26, 2021            Respectfully Submitted,


*s/ Michael H. Pearson*

Daniel L. Warshaw (CA Bar No. 185365)
Michael H. Pearson (CA Bar No. 277857)
**PEARSON, SIMON & WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
Telephone: (818) 788-8300
*dwarshaw@pswlaw.com*
*mpearson@pswlaw.com*

Melissa S. Weiner*
Daniel K. Asiedu*
**PEARSON, SIMON & WARSHAW, LLP**
800 LaSalle Avenue, Suite 2150
Minneapolis, Minnesota 55402
Telephone: (612) 389-0600
*mweiner@pswlaw.com*
*dasiedu@pswlaw.com*

Rebecca K. Timmons (Fla. Bar No. 121701)*
**LEVIN PAPANTONIO RAFFERTY**
316 S. Baylen Street, Suite 600
Pensacola, Florida 32502
Telephone: (850) 435-7140
*btimmons@levinlaw.com*

Blake Hunter Yagman*
**MILBERG PHILLIPS GROSSMAN LLP**
100 Garden City Plaza, Suite 500
Garden City, New York 11530
Telephone: (212) 594-5300

byagman@milberg.com

Rachel Soffin*
**GREG COLEMAN LAW P.C.**
800 S. Gay Street, Suite 1100
Knoxville, Tennessee 37929
Telephone: (865) 247-0080
rsoffin@gregcolemanlaw.com


Daniel K. Bryson*
Harper T. Segui*
**WHITFIELD BRYSON LLP**
900 West Morgan Street
P.O. Box 12638
Raleigh, North Carolina 27605
Telephone: (919) 600-5000
dan@whitfieldbryson.com
harper@whitfieldbryson.com

*Attorneys for Plaintiff & Proposed Class*


* *Pro Hac Vice* Forthcoming